IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 1, 2017

**IN RE JASE P.**

**Appeal from the Juvenile Court for Knox County**
**No. 158400     Timothy E. Irwin, Judge**

_____

**No. E2016-02519-COA-R3-PT**

_____

This appeal arises from the termination of a father's parental rights. The Tennessee Department of Children's Services ("DCS") filed a petition against Anthony G. ("Father") in the Juvenile Court for Knox County ("the Juvenile Court") seeking to terminate Father's parental rights to his son, Jase P. ("the Child"). Father had been incarcerated and unable to parent the Child since the Child's birth. After a trial, the Juvenile Court terminated Father's parental rights on the grounds of wanton disregard and various grounds coming under the putative father statute at Tenn. Code Ann. § 36-1-113(g)(9)(A). Father appeals. We affirm all grounds for termination found against Father. We further affirm that termination of Father's parental rights is in the Child's best interest. We, therefore, affirm the judgment of the Juvenile Court in its entirety.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and KENNY W. ARMSTRONG, JJ., joined.

Gregory E. Bennett, Seymour, Tennessee, for the appellant, Anthony G.

Herbert H. Slatery, III, Attorney General and Reporter, and, Brian A. Pierce, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

# OPINION

## Background

The Child was born out of wedlock in December 2015 and soon thereafter entered DCS custody. The Child's mother ("Mother") later surrendered her parental rights to the Child. The Child's birth certificate did not identify a father. However, two males were suspected of being the Child's father. In March or April of 2016, DNA testing revealed that Father was the Child's biological father. In April 2016, DCS filed its petition in the Juvenile Court seeking to terminate the incarcerated Father's parental rights to the Child. Trial was held in November 2016. Father and the Child's Foster Mother testified.

Father testified first. Father and Mother had dated from 2008 through November 2014. During this time, Father used pain pills and methamphetamine with Mother. After Father and Mother broke up, Mother became involved with a new boyfriend. Nevertheless, Father and Mother continued to have sexual relations. Sometime around May 2015, Father learned that Mother was pregnant. Mother told Father that while she was not sure he was the father, it was a possibility. Father took Mother to a drug clinic so she could begin treatment for drug abuse. Father paid $400 for Mother's treatment. In June 2015, Father, who already had a lengthy history of criminal behavior, incurred more charges. Father was arrested on a variety of drug-related charges on which he later pled guilty. Father also pled guilty to a federal gun possession charge. Father was sentenced altogether to six years in prison arising from the June 2015 incident. Father stated that he is working while in custody which allows him to earn two days credit for each day served. Father did not file a petition to establish his paternity of the Child. Father has been incarcerated for the entire life of the Child. Indeed, Father has never met the Child. Father testified that his mother was a possible kinship placement for the Child. However, Father's mother never has been granted custody.

Foster Mother testified. Foster Mother testified to the severe drug exposure-related health problems the Child suffered from. The Child suffered from neonatal abstinence syndrome. The Child experienced tremors, fever, and eating problems, among other things. While the Child's condition has improved, the Child still requires significant medical attention. According to Foster Mother, the Child has bonded well with her new family. Foster Mother intends to adopt the Child if permitted.

In December 2016, the Juvenile Court entered its final judgment terminating Father's parental rights to the Child. The Juvenile Court, applying the standard of clear and convincing evidence, found the following grounds against Father: 1) wanton disregard; 2) failure to manifest an ability and willingness to assume legal and physical custody of the child; 3) failure to establish paternity; and 4) risk of substantial harm to the

physical or psychological welfare of the child. The Juvenile Court found also by clear and convincing evidence that termination of Father's parental rights is in the Child's best interest. We quote from the Juvenile Court's detailed final judgment as pertinent:

1. This child was removed from his mother's custody due to her substance abuse. The child's urine drug screen at birth was positive for benzodiazepines and his meconium was positive for amphetamines, methamphetamines, benzodiazepines, Subutex, and marijuana. The child's mother admitted being addicted to opiates and using Suboxone and Subutex intravenously and without the benefit of a prescription to curb her cravings for opiates. The baby was moved to the NICU where he was treated with morphine until December 23, 2015, to mitigate withdrawal symptoms of Neonatal Abstinence Syndrome.

2. Respondent was in jail when his son was born. His criminal history as an adult began in 2008 when he was convicted for "going armed" and served ten days in jail. In January 2009 he was convicted on the charge of aggravated criminal trespass after going into a home with the intent to take something, although he then changed his mind. A few months later he did 48 hours in jail for driving under the influence. In August 2009 he was charged theft of property and aggravated burglary in Anderson County, Tennessee. While he was out awaiting trial on those charges, he was charged with sale and delivery of schedule II drugs ("pills") in Monroe County, Tennessee. Those charges were all resolved in March 2011 with an effective sentence of six years imprisonment. Respondent had served 160 days in jail and was released on probation. He was arrested again about three months later after failing a drug screen and had to spend ninety days in jail. He was then released back to probation.

3. Respondent and the child's mother were in an "on-and-off" relationship for eight or nine years, ending in November 2014. They lived together in hotel rooms, apartments, and with Respondent's mother. They used drugs together. According to Respondent, the mother would run off and then come back; sometimes she stayed with a cousin, then she would be back with Respondent. They used pain pills and methamphetamine together; when they were together, they got high together. Respondent never sold methamphetamine but he did sell marijuana and roxycodone (pain pills). He quit pills in 2012 after going to rehab but resumed using marijuana and methamphetamine. In November 2014, when Respondent and the mother were last living together, they were using marijuana and methamphetamine together. He testified that his longest period of sobriety was about three months in 2013. He was not getting high all the time; he

was on probation and knew he had to be able to pass drug screens or he would go back to jail.

4. After they "broke up" in November 2014, the child's mother moved out. She had a new boyfriend and was living with him but continued to come by occasionally and had sex with Respondent. In early May 2015 the mother contacted Respondent and told him she was pregnant and that he might be the father of her baby; she wasn't sure. Respondent saw her one time after that. She talked with him about her dependence on opiates and her fear that her drug use would be bad for the baby. She told him she needed help. Respondent drove her to Express Health Care in Harriman, Tennessee, and gave her at least $400 cash to pay for Subutex treatment.

5. About three weeks later, on June 5, 2015, Respondent was arrested in Anderson County, Tennessee, on charges of felony possession of a firearm, possession of marijuana for resale, possession of methamphetamine, possession of drug paraphernalia, possession of Schedule IV narcotics, and violation of a drug-free school zone; he was also held for violation of probation. He had been found with drugs and a gun and he had been using. He has been incarcerated continuously since then. On December 1, 2015, a federal grand jury returned an indictment charging Respondent with being a felon in possession of a firearm and ammunition. On March 22, 2016, Respondent entered a guilty plea to that charge and, on September 6, 2016, he was sentenced in federal court to 60 months of imprisonment followed by three years of supervised release. On October 18, 2016, he entered guilty pleas in Anderson County, Tennessee, to the charges of possession of marijuana for resale, possession of marijuana, possession of methamphetamine, and violation of probation. He received an effective sentence revoking his probation and requiring that he serve his previous six year sentence. The state and federal sentences are running concurrently. Since his arrest in June 2015, Respondent has been held in the Anderson County jail, and in the custody of the U.S. Marshal in jails in Irwin County, Georgia and Blount County, Tennessee, moving from one to another depending upon appearance dates.

6. By the time he was arrested in June 2015, Respondent was aware of the mother's pregnancy and of the possibility that he might be the father. The child was born in December 2015 and entered foster care before being discharged from the hospital. On February 1, 2016, the child's case manager met with Respondent in the Blount County Jail. They reviewed the child's permanency plan and the Criteria & Procedures for Termination of Parental Rights. Respondent signed the Criteria and kept a copy. He admitted that he knew about the child because the mother had told him

-4-

when she found out she was pregnant. At that point he had done nothing to establish paternity or to determine parentage. In March or April 2016 he learned from his mother that DNA testing had confirmed that he was the child's father. He still did nothing to establish paternity. He told this Court that he had "a lot going on in the last 17 months", had been moved from jail to jail, and was not sure of the location of his box of paperwork and personal possessions.

7. Upon those facts, the Court finds that Respondent was incarcerated when this petition was filed and that prior to this incarceration, Respondent engaged in conduct which exhibits a wanton disregard for the welfare of the child. He knew the mother was pregnant. He knew he could be the father of her child. This Court believes that Respondent's use of his own money (at least $400) to pay for the mother's Subutex treatment demonstrates that he had a strong suspicion that he was the father. He nevertheless got himself into more trouble. He continued to use drugs and committed additional crimes. Respondent's own actions taken while he knew the mother was pregnant and knew the child was possibly his ensured that he would be sent back to prison. His continued destructive behavior demonstrated indifference and a wanton disregard for his own welfare much less that of the child.

8. The Court further finds that Respondent failed to file a petition to legitimate the child within thirty (30) days after notice of alleged paternity; that he failed to manifest an ability and willingness to assume legal and physical custody of the child; and that awarding legal and physical custody of the child to Respondent would pose a risk of substantial harm to the physical or psychological welfare of the child. He did nothing, not when he suspected the child was his, not when he knew for sure the child was his. Even incarcerated, he could have done something. He was able to write a letter. He knew that failure to take action could result in termination of any parental rights he might have. He just put all his eggs in one basket, relying on his mother to petition for custody. That petition was dismissed. Due to his own actions, Respondent is not in a position to assume physical custody of this child. He knows nothing of the child's heightened physical and psychological needs secondary to his *in utero* drug exposure. Awarding legal and physical custody of this child to Respondent would not only be cruel but would subject the child to great risk.

9. The Court received no proof as to the allegation that Respondent committed severe abuse against this child and that allegation with [sic] withdrawn.

# III

1. Respondent has not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in his home. He is in prison, he has no home. He did receive "reasonable efforts by available social services agencies" to effect an "adjustment" in his conduct. Probation made efforts to rehabilitate him and he violated. Due to his own conduct he has not been able to maintain regular visitation or other contact with the child and no relationship at all has otherwise been established between Respondent and the child. Respondent has never seen his son. A change of caretakers and physical environment is likely to have a detrimental effect on the child's emotional, psychological and medical condition. Such a change from the only family he has ever known would destroy this child emotionally and psychologically and would have a terrible effect on his medical condition. This child was severely abused by his mother's drug abuse during her pregnancy and he has suffered for it. Respondent has shown neglect toward this child by his indifference toward the child's welfare while committing his criminal acts. He is without a healthy and safe physical environment for the child. Prior to his current incarceration, he engaged in criminal activity and in such use of alcohol or controlled substances as may render Respondent consistently unable to care for the child in a safe and stable manner. And, due to his incarceration, Respondent has not paid child support.

2. The child's mother has surrendered her parental rights.

3. The Department of Children's Services has made reasonable efforts toward achieving permanency for this child.

4. The child is entitled to a safe, secure and loving home. He was diagnosed with neonatal abstinence syndrome at birth due to his mother's drug use. He is followed by multiple specialists including a neonatal specialist, a gasteroenterologist, a pediatric physiatrist, Tennessee Early Intervention Services, occupational and physical therapists, and his primary care physician and has required several emergency room visits. During his first seven months he had over 100 medical and therapy appointments. He is not on target developmentally. His foster mother described his brain as "different", in "fight or flight" mode a lot of the time that interferes with his ability to learn. He gets over-stimulated and overwhelmed easily and acts with aggression and impulsivity. He is allergic to lactose and soy, requires an iron supplement to address anemia, and is monitored for a hernia. He is nevertheless loved and cherished in a kinship foster home where he has the chance to achieve permanency through adoption. That adoption will also

allow him the opportunity to maintain contact with his biological grandfather and his older half-brother, now in the grandfather's custody. This child deserves to grow up knowing where he will lay his head at night.

5. It is, therefore, in the best interest of [the Child] and the public that all of Respondent's parental rights to this child be terminated and the complete custody, control, and full guardianship of the child be awarded to the State of Tennessee, Department of Children's Services, with the right to place him for adoption and to consent to such adoption in loco parentis.

Father timely appealed to this Court.

## Discussion

We restate the issues Father raises on appeal as follows: 1) whether the Juvenile Court erred in finding the ground of failure to manifest an ability and willingness to assume legal custody of the Child; 2) whether the Juvenile Court erred in finding the ground of failure to establish paternity of the Child; 3) whether the Juvenile Court erred in finding the ground of risk of substantial harm to the physical or psychological welfare of the Child; 4) whether the Juvenile Court erred in finding the ground of wanton disregard; and, 5) whether the Juvenile Court erred in finding that termination of Father's parental rights is in the Child's best interest.

As our Supreme Court has instructed regarding the standard of review in parental termination cases:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[1] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae*

---

[1] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(I)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[2] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[3] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id.* This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the

---

[2] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[3] Tenn. Code Ann. § 36-1-113(i).

existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Our Supreme

Court, however, has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26 (footnote omitted). As such, we review each of the grounds for termination.

Tenn. Code Ann. § 36-1-113 provides concerning the ground of abandonment:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1) (Supp. 2016).

In pertinent part, Tenn. Code Ann. § 36-1-102(1)(A) provides:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

* * *

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child; or . . . .

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2014).

-11-

Regarding the putative father grounds, the statute provided at the time of the filing of the petition to terminate Father's parental rights:

(9)(A) The parental rights of any person who, at the time of the filing of a petition to terminate the parental rights of such person, or if no such petition is filed, at the time of the filing of a petition to adopt a child, is the putative father of the child may also be terminated based upon any one (1) or more of the following additional grounds:

(i) The person has failed, without good cause or excuse, to pay a reasonable share of prenatal, natal, and postnatal expenses involving the birth of the child in accordance with the person's financial means promptly upon the person's receipt of notice of the child's impending birth;

(ii) The person has failed, without good cause or excuse, to make reasonable and consistent payments for the support of the child in accordance with the child support guidelines promulgated by the department pursuant to § 36-5-101;

(iii) The person has failed to seek reasonable visitation with the child, and if visitation has been granted, has failed to visit altogether, or has engaged in only token visitation, as defined in § 36-1-102(1)(C);

(iv) The person has failed to manifest an ability and willingness to assume legal and physical custody of the child;

(v) Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; or

(vi) The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity by the child's mother, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(3);

Tenn. Code Ann. § 36-1-113(g)(9)(A) (2014 & Supp. 2016).

Father raises issues of whether the Juvenile Court erred in finding certain of the putative father grounds against him. However, we first must consider whether these grounds even apply to Father. Under Tennessee Supreme Court precedent in the case of *In re Bernard T.*, 319 S.W.3d 586 (Tenn. 2010), putative biological fathers are not liable

to having their parental rights terminated on the grounds provided for in Tenn. Code Ann. § 36-1-113(g)(9)(A). Our Supreme Court stated: "The grounds for termination in Tenn. Code Ann. § 36-1-113(g)(9) cannot be used to terminate the rights of a person who is a child's biological parent, legal parent, or putative biological father at the time the termination petition is filed." *Id*. at 599. DCS states in its brief that "Father was a 'putative father' [and] . . . the biological father of the child and, at the time of the filing of the petition to terminate his parental rights, he had acknowledged his paternity to DCS through DNA testing. Tenn. Code Ann. § 36-1-102(43); § 36-1-117(c)(3)." DCS also cites evidence in the record that Father at one point entered into a permanency plan. Therefore, under *In re Bernard T.*, Father is in the category of persons who are not liable to having their parental rights terminated under Tenn. Code Ann. § 36-1-113(g)(9).

That, however, does not end the inquiry, because on March 23, 2016, our General Assembly amended the statutes pertaining to putative fathers. *See* 2016 Pub. Acts, c. 636, eff. March 23, 2016. Tenn. Code Ann. § 36-1-102(43) (Supp. 2016) defines a putative father as a "biological or alleged biological father who, at the time of the filing of a petition to terminate the parental rights of such person . . . meets at least one (1) of the criteria set out in § 36-1-117(c) and is not a legal parent." Father appears to fit the bill as a putative father under this definition. Moreover, as amended, Tenn. Code Ann. § 36-1-113(g)(9)(A) explicitly applies to "the putative father of the child."

We are confronted with *In re Bernard T.*, which never has been overturned judicially, and the March 2016 legislative amendments, which reasonably can be construed as removing the statutory basis for the *In re Bernard T.* ruling. In the recent case of *In re E.C.*, No. E2016-02582-COA-R3-PT, 2017 WL 2438574, at *6 (Tenn. Ct. App. June 6, 2017), *no appl. perm. appeal filed as of this Opinion*, this Court stated that while "there was some question regarding whether these additional grounds [under Tenn. Code Ann. § 36-1-113(g)(9)(A)] were applicable to putative fathers [given *In re Bernard T.*] . . . the legislature amended the wording of the statute to explicitly state that these additional grounds applied to 'the putative father of the child.' " We proceeded to find the grounds applicable to a father who in December 2015 was confirmed by DNA testing to be the child's biological parent, and a petition seeking to terminate this father's parental rights was filed in June 2016. *Id*. at *2. On the other hand, in the also very recent case of *In re Candice H.*, No. M2016-02305-COA-R3-PT, 2017 WL 2365008, at *11 n. 6 (Tenn. Ct. App. May 31, 2017), *no appl. perm. appeal filed as of this Opinion*, we accepted DCS's concession that *In re Bernard T.* was binding precedent and that the father in that case was a putative biological father not liable to having his parental rights terminated by Tenn. Code Ann. § 36-1-113(g)(9)(A) in keeping with the holding of *In re Bernard T.* We therefore reversed the putative father ground for termination, which at any rate was cumulative in that case, of failure to establish paternity. *Id*. Our research reflects that over the years, this Court has not been entirely consistent in our application

of Tenn. Code Ann. § 36-1-113(g)(9)(A), whether before or after the March 2016 legislative amendments. We, respectfully, suggest that our Supreme Court accept the opportunity, if a Rule 11 application is filed, to address this matter of exactly when the grounds found at Tenn. Code Ann. § 36-1-113(g)(9)(A) as amended may be applied. In the meantime, we will give effect to the legislative amendments. Father is a putative father for purposes of Tenn. Code Ann. § 36-1-113(g)(9)(A).

The first putative father ground we address is whether the Juvenile Court erred in finding the ground of failure to manifest an ability and willingness to assume legal custody of the Child. Father argues on appeal that because he has been incarcerated continuously since June 5, 2015, and DCS has had custody of the Child, he has never had any meaningful opportunity to assume legal custody of the Child. As relevant, the Juvenile Court found:

> [Father] did nothing, not when he suspected the child was his, not when he knew for sure the child was his. Even incarcerated, he could have done something. He was able to write a letter. He knew that failure to take action could result in termination of any parental rights he might have. He just put all his eggs in one basket, relying on his mother to petition for custody. That petition was dismissed.

The evidence does not preponderate against the Juvenile Court's findings relative to this issue. We find, as did the Juvenile Court, that the ground of failure to manifest an ability to assume legal and physical custody of the Child is proven by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of failure to establish paternity of the Child. Father argues that he did not truly know for sure he was the Child's father until the DNA test results came in, and that, in any case, DCS could establish Father's paternity more readily than Father. We refer to the findings of the Juvenile Court that "[Father] did nothing, not when he suspected the child was his, not when he knew for sure the child was his." We find, as did the Juvenile Court, that the ground of failure to establish paternity of the Child is proven by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of risk of substantial harm to the physical or psychological welfare of the Child. Father argues that the record is completely silent as to whether the Child would incur any psychological harm should he be placed with Father. Father argues also that he could learn how to care for the Child just as well as the foster family does. The Juvenile Court found, as pertinent: "Due to his own actions, Respondent is not in a position to assume physical

-14-

custody of this child. He knows nothing of the child's heightened physical and psychological needs secondary to his *in utero* drug exposure. Awarding legal and physical custody of this child to Respondent would not only be cruel but would subject the child to great risk." The evidence does not preponderate against these findings made by the Juvenile Court relative to this issue. We find, as did the Juvenile Court, that the ground of risk of substantial harm to the physical or psychological welfare of the Child has been proven by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of wanton disregard. Under *In re Bernard T.*, where any grounds under Tenn. Code Ann. § 36-1-113(g)(9)(A) are applicable, grounds from Section 36-1-113(g)(1) through Section 36-1-113(g)(8) are inapplicable. This holding, of course, was before the recent legislative amendments to the statutes. In *In re E.C.*, we acknowledged that "no court has yet considered whether the 2016 amendment affected this part of the holding in *In re Bernard T.*" *In re E.C.*, 2017 WL 2438574, at \*10. In *In re E.C.* we went on to conclude that we did not have to consider the issue since we found that the ground of wanton disregard was not proven by clear and convincing evidence. *Id*. This issue is another on which our Supreme Court could provide clarity. In the present case, as we discuss further below, we affirm all of the grounds found for termination, and so even if we err with respect to finding wanton disregard applicable, the outcome is the same.

Father became aware of Mother's pregnancy only three weeks before the June 2015 incident that led to his incarceration. Father argues on appeal regarding the June 2015 incident that "this single event in and of itself is not sufficient conduct to demonstrate wanton disregard by clear and convincing evidence."

Wanton disregard has no precise definition. However, as this Court has stated: "We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005). Further, in *In re Chandler M.*, M2013-02455-COA-R3-PT, 2014 WL 3586499, at \*4 (Tenn. Ct. App. July 21, 2014), *rule 11 appl. perm. appeal dismissed Sept. 29, 2014*, we concluded that a father need not know with 100% certainty that he is the child's father for his actions to potentially constitute wanton disregard for the child's welfare, only that he had sex with the child's mother and he knew she became pregnant. We are mindful that in the present case, the pre-incarceration conduct of Father's cited by the Juvenile Court comprised a single incident. Nevertheless, certain conduct may be of such magnitude that it constitutes wanton disregard for the welfare of a child even if it is a single incident. Father knew in May 2015 that Mother was pregnant and that he might well be the father. In fact, Father even paid for Mother to begin drug treatment. Despite

this knowledge, Father proceeded to incur a number of drug charges and a federal gun possession charge, the result being that he is incarcerated and unable to provide for the welfare of the Child. Father also violated probation for a previous charge. In committing his slew of crimes in the June 2015 incident, Father demonstrated wanton disregard for the Child's welfare. We find and hold, as did the Juvenile Court, that the ground of wanton disregard has been proven by clear and convincing evidence.

The final issue we address is whether the Juvenile Court erred in finding that termination of Father's parental rights is in the Child's best interest. The evidence does not preponderate against the Juvenile Court's detailed best interest findings, made in accordance with Tenn. Code Ann. § 36-1-113(i). The Child does not even know Father. The Child has suffered terribly from drug exposure-related ailments and requires special care. Father is in absolutely no position to provide said care. The evidence is that the Child has bonded well with the Foster family and is on the mend after a troubled start in life. We find and hold, as did the Juvenile Court, that the evidence is clear and convincing that termination of Father's parental rights is in the Child's best interest. In summary, we affirm the judgment of the Juvenile Court in its entirety.

## **Conclusion**

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Anthony G., and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

-16-